In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 25-1713

BBLI EDISON, LLC, a Delaware limited liability company,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, Department of Housing,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 1:24-cv-04925 — **Mary M. Rowland**, *Judge.*

———————————

ARGUED NOVEMBER 14, 2025 — DECIDED JULY 22, 2026

———————————

Before SCUDDER, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

SCUDDER, *Circuit Judge*. A Chicago ordinance requires anyone who obtains a rental property through foreclosure to negotiate new leases with existing tenants in good faith. If a tenant declines to renew a lease, the ordinance also requires the landlord to pay the tenant $10,600 to assist with relocation expenses. BBLI Edison contends that this amounts to an uncon-

stitutional taking. The district court disagreed and dismissed the case. We affirm.

**I**

**A**

Chicago enacted the current version of the Keep Chicago Renting Ordinance in 2021. Its stated purposes are "to protect and promote the health, safety, and welfare of its residents" and to "mitigate the damaging effects on our communities of foreclosures …." Chi., Ill. Mun. Code § 5-14-010. To effect these purpose, the Ordinance requires new owners of rental properties, acquired through foreclosure, to "negotiate[] in good faith for a new rental agreement that lasts at least 12 months" with the existing tenants. *Id.* § 5-14-050(a)(1). If for any reason a tenant does not sign a new lease, the new owner must pay them a $10,600 relocation assistance fee. See *id.* The payment appears to have no requirements, such as the tenant committing to using the money to cover relocation costs. Nor, does it seem, that the tenant must represent that they used the payment to make a security deposit on a new apartment, to cover moving costs, or the like. By its terms, the Ordinance does not apply retroactively to owners who purchased their buildings before its enactment. See *id.* § 5-14-030(a).

**B**

BBLI's complaint supplies the pertinent facts. On September 23, 2022, BBLI's unidentified predecessors-in-interest filed a foreclosure action for a building at 5200 North Sheridan Road in Chicago. BBLI took control of the property through a sheriff's deed dated February 9, 2024.

When BBLI took over the building, over 220 tenants resided there. BBLI notified them of their rights under the Or-

dinance. At least five tenants have declined new leases and requested that BBLI pay them the $10,600 relocation assistance fee.

Invoking 42 U.S.C. § 1983, BBLI sued the City of Chicago in federal court. It asked the district court to enjoin enforcement of the Ordinance, alleging that it ran afoul of the Takings Clause in various ways. The district court dismissed BBLI's complaint, finding no constitutional violation.

Declining an opportunity to amend its complaint, BBLI now appeals.

## II

### A

"[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V; see also *Sheetz v. County of El Dorado*, 601 U.S. 267, 276 (2024) ("[T]he Fourteenth Amendment … incorporates the Takings Clause against the States."). Not to be mistaken for "a poor relation among the provisions of the Bill of Rights," many recent Supreme Court decisions illustrate the protection afforded by the Takings Clause. *Knick v. Township of Scott*, 588 U.S. 180, 189 (2019) (cleaned up). We begin with an overview of the legal landscape of physical takings, often referred to as "*per se*" takings in the case law.

Physical takings can occur whether "the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree)." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). The "essential question" is "whether the government has physically taken property for itself or someone else—by whatever means." *Id.*

The clearest forms of physical takings are "physical appropriations." *Id.* at 148 ("The government commits a physical taking when it uses its power of eminent domain to formally condemn property."). A lawful taking may occur in these scenarios so long as the government then honors its obligation to justly compensate the former landowner. See *Pung v. Isabella County*, 146 S. Ct. 1964, 1970–71 (2026) (discussing acceptable ways to determine "just compensation" under the Takings Clause).

Physical takings include more than just appropriations. "[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). They also extend to forced temporary occupations. See *Cedar Point Nursery*, 594 U.S. at 162 (holding that an access right for union organizers "constitutes a per se physical taking").

The Takings Clause protects personal property too. See *Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015) ("The reserve requirement imposed by the Raisin Committee is a clear physical taking" because "[a]ctual raisins are transferred from the growers to the Government."). And that personal property can include cash. See *Tyler v. Hennepin County*, 598 U.S. 631, 642 (2023) (holding that following a forfeiture sale on a home for unpaid taxes, the government may not retain "the surplus in excess of the debt owed").

But physical takings are not limitless. "[T]axes, user fees, and similar laws and regulations that may impose financial burdens on property owners" do not qualify as physical takings. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595,

615 (2013). The government may also impose certain types of requirements on the landlord-tenant relationship without causing a physical taking. See *Yee v. City of Escondido*, 503 U.S. 519, 532 (1992) ("[The Escondido rent control ordinance] is a regulation of petitioners' *use* of their property, and thus does not amount to a *per se* taking."); see also *Loretto*, 458 U.S. at 440 ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.").

B

Chicago's Ordinance first and foremost regulates the landlord-tenant relationship. And "statutes regulating the economic relations of landlords and tenants," the Supreme Court has held, "are not *per se* takings." *F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) (collecting cases). States may "require landlords to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like." *Loretto*, 458 U.S. at 440. We have found no authority prohibiting something like the Ordinance.

The relocation assistance fee requirement is not a physical taking just because it transfers wealth. See *Yee*, 503 U.S. at 529–30 ("[T]he existence of the [wealth] transfer in itself does not convert regulation into physical invasion."). Other permissible regulations "can … be said to transfer wealth from the one who is regulated to another." *Id.* at 529. Rent control is the quintessential example. See *id.* It "often transfers wealth from landlords to tenants by reducing the landlords' income and the tenants' monthly payments." *Id.* Yet that does not make it a physical taking. See *id.* at 532.

Indeed, the Ordinance seems to operate as an indirect (and clunky) form of rent control. Current and prospective landlords know that they will need to offer lease terms more valuable than the $10,600 relocation assistance fee to avoid tenants leaving.

We are not alone in our conclusion. The Ninth Circuit resolved a similar question in much the same way. See *Ballinger v. City of Oakland*, 24 F.4th 1287, 1293 (9th Cir. 2022) (holding a "relocation fee is not an unconstitutional physical taking" in part because it resembles "rent control").

We appreciate that this case is not identical to *Ballinger*. There the landlord's decision to evict tenants triggered the relocation fee. See *id.* at 1291. Under Chicago's Ordinance, however, tenants decide whether they will renew or opt to receive the fee. See Chi., Ill. Mun. Code § 5-14-050(a)(1). But we do not see this distinction as dispositive. Regardless of which party is the impetus for the termination of the lease, the landlord's inability to extend it requires that they assist the tenant in resettling. In short, there is no disputing that the Ordinance regulates an aspect of the landlord-tenant relationship.

## C

To be sure, BBLI's position has something to it. The Supreme Court appears to have endorsed the view that "when the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, a *per se* takings approach is the proper mode of analysis." *Koontz*, 570 U.S. at 614 (cleaned up); see also *Ballinger*, 24 F.4th at 1295 (reading *Koontz* the same way). And it has held that a demand for money satisfied that test when it "direct[ed] the owner of a

particular piece of property to make a monetary payment," and thereby "burdened … ownership of a specific parcel of land." *Koontz*, 570 U.S. at 613. Read broadly, this suggests that the Ordinance may amount to a physical taking because it directs the owners of particular pieces of property—newly foreclosed buildings—to make specific monetary payments to their tenants.

But, in light of the state of today's law, we are not inclined to read *Koontz* so expansively. In *Koontz* the government refused to grant a landowner permits unless he reduced the size of his proposed development or paid contractors to improve some nearby government-owned land. See *id.* at 601–02. The Supreme Court viewed practices like this as "functionally equivalent to other types of land use exactions." *Id.* at 612. In contrast, Chicago's Ordinance adds no conditions to the receipt of a benefit, and it applies to an entire class of landowners—those who acquire residential buildings out of foreclosure. Cf. *Sheetz*, 601 U.S. at 280 (leaving unresolved "whether a permit condition imposed on a class of properties must be tailored with the same degree of specificity as a permit condition that targets a particular development").

In no way are the trends in the Supreme Court's recent takings cases lost on us. See, *e.g.*, *Koontz*, 570 U.S. at 619 (holding in 2013 that "the government's demand for property from a land-use permit applicant must satisfy" criteria developed to evaluate whether an unconstitutional taking occurred); *Horne*, 576 U.S. at 361 (holding in 2015 that the government's acquisition of a percentage of raisins to help regulate the market constituted a compensable taking); *Knick*, 588 U.S. at 194, 206 (holding in 2019 that "[a] property owner may bring a takings claim under § 1983 upon the taking of his property with-

out just compensation by a local government" and overruling a prior case requiring exhaustion of "state procedures for obtaining compensation before bringing a federal suit"); *Cedar Point Nursery*, 594 U.S. at 162 (holding in 2021 that a regulation requiring union representatives be able to access property constituted a compensable taking); *Tyler*, 598 U.S. at 647 (holding in 2023 that the government's retention from a forfeiture sale of more than the homeowner owed in taxes constituted a compensable taking).

We are thus confronted on the one hand with expanding sets of circumstances that implicate the Takings Clause and on the other with a specific line of analogous precedent that applies to the landlord-tenant relationship, see, *e.g.*, *Yee*, 503 U.S. at 532; *Loretto*, 458 U.S. at 440; *Fla. Power Corp.*, 480 U.S. at 252. In these situations, the Supreme Court has reminded lower courts of our role. See *Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); see also *NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 408 n.17 (4th Cir. 2022) ("Accepting our place, we do our level best to apply the law as it stands, not as it might one day become."); *Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB*, 155 F.4th 1023, 1054 (9th Cir. 2025) ("We only applied the law as it is, compelled by decades of precedent, not as what we wish, predict, or think it to be."). We follow that guidance here.

In the final analysis, then, we focus on the specific line of cases dealing with the landlord-tenant relationship. And those precedents are clear that "statutes regulating the economic relations of landlords and tenants are not *per se* tak-

ings." *Fla. Power Corp.*, 480 U.S. at 252 (collecting cases). We see no physical taking.

## III

BBLI also challenges the Ordinance as a partial regulatory taking, or use restriction, that overburdens its ability to use the property. See *Cedar Point Nursery*, 594 U.S. at 148. We evaluate alleged regulatory takings by balancing the *Penn Central* factors, including "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* at 140 (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). All three factors favor the City of Chicago.

*First*, BBLI's complaint says little about the economic impact of the Ordinance. As this case comes to us at the pleading stage, BBLI had complete control over the facts before the district court. But it did not allege that the Ordinance's existence made operating the rental property economically infeasible. The district court even gave BBLI an opportunity to amend its complaint, but the firm elected not to do so. See *Keene v. Consolidation Coal Co.*, 645 F.3d 844, 850 (7th Cir. 2011) (concluding that minimal data provided by plaintiff "proves nothing about the economic impact of the legislation on [the plaintiff] itself, which is necessary to establish a taking").

*Second*, the Ordinance did not interfere with BBLI's reasonable investment-backed expectations. BBLI took possession of the property at 5200 North Sheridan Road well after the Ordinance went into effect. Like any rational actor entering the residential leasing market in Chicago, it presumably estimated what percentage of its tenants would demand the relocation assistance fee as opposed to signing new leases.

This factor weighs heavily against finding a regulatory taking. Cf. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1074 (7th Cir. 2013) (finding no taking and reasoning that bar owners should have anticipated the expansion of a smoking ban that hurt their businesses).

*Third*, the Ordinance regulates an aspect of a landlord-tenant relationship. And today's law is clear that state and local authorities have broad power over that relationship. This factor favors Chicago as well. Cf. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986) ("This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation.").

**IV**

BBLI lastly challenges the Ordinance as an unconstitutional condition (also commonly called an exaction). But the test BBLI asks us to apply is not a good fit for its concerns about the Ordinance. Regardless, even if we shoehorn the facts into an unconstitutional conditions analysis, the City still prevails.

The test BBLI urges us to use normally applies to the permitting process. Because "the government can deny a building permit to further a 'legitimate police-power purpose,' then it can also place conditions on the permit that serve the same end." *Sheetz*, 601 U.S. at 274 (quoting *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 836 (1987)). But those "conditions must have an 'essential nexus' to the government's land-use interest." *Id.* at 275 (quoting *Nollan*, 483 U.S. at 837). They also "must have 'rough proportionality' to the development's

impact on the land-use interest." *Id.* at 275–76 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994)). In essence, the government cannot avoid paying just compensation by acquiring property or other rights by leveraging its ability to extort concessions indirectly. See *Koontz*, 570 U.S. at 605–06.

The unconstitutional conditions doctrine is a mismatch here. BBLI is not asking for permission to build something or to engage in some other lawful activity for which the City of Chicago is withholding permission based on a condition. Rather, the Ordinance directly requires BBLI to pay its tenants a fee if they do not renew their leases. Chicago is not hiding behind a permitting or similar process. It is mandating the transfer of funds upon a tenant's decision not to accept the terms of a new lease offered by the landlord.

But even applying this ill-fitting test, BBLI still falls short because the City has an interest in keeping its residents housed. That is the purpose the Ordinance seeks to serve, providing it with an essential nexus to the government's interest. And BBLI makes no effort to show that any relocation assistance fee is disproportional to the impact on Chicago's interest. It provides no estimates for actual moving costs, nor does it explain how it would need to adjust its lease rates to prevent tenants from taking the fee. We therefore are unable to find an unconstitutional condition on these facts.

\* \* \*

We emphasize that our opinion passes no judgment on the wisdom or utility of the Ordinance. But given our reading of today's Takings Clause precedent, BBLI is unable to carry its burden. That conclusion leaves us to AFFIRM.